No. 24-13111

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

ALABAMA STATE CONFERENCE OF THE NAACP, et al.,
*Plaintiffs-Appellees*,

v.

STEVE MARSHALL, in his official capacity as
Attorney General of Alabama,
*Defendant-Appellant*.

◆

On Appeal from the United States District Court for the
Northern District of Alabama, No. 2:24-CV-420-RDP

## DEFENDANT-APPELLANT'S OPENING BRIEF

Steve Marshall
   *Attorney General*
Edmund G. LaCour Jr.
   *Solicitor General*
Soren Geiger
   *Assistant Solicitor General*
Charles McKay
   *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Defendant-Appellant*

*AL NAACP v. Marshall*, No. 24-13111

## CERTIFICATE OF INTERESTED PERSONS

Per Rule 26.1 and Eleventh Circuit Rule 26.1, the undersigned certifies that the following may have an interest in the outcome of this appeal:

1. Alabama Disabilities Advocacy Program – *Plaintiff-Appellee*;

2. Alabama State Conference of the NAACP – *Plaintiff-Appellee*;

3. Badat, Amir – *Counsel for Plaintiffs-Appellees*;

4. Boettcher, Ellen – *Counsel for Plaintiffs-Appellees*;

5. Burgess, Tiffani – *Counsel for Plaintiffs-Appellees*;

6. Canada, Larry G. – *Counsel for Plaintiffs-Appellees*;

7. Fitch, Lynn – *Counsel for Amicus Curiae*;

8. Geiger, Soren – *Counsel for Defendant-Appellant*;

9. Greater Birmingham Ministries – *Plaintiff-Appellee*;

10. Griffin, Tim – *Counsel for Amicus Curiae*;

11. Hattix, Laurel – *Counsel for Plaintiffs-Appellees*;

12. Heard, Bradley E. – *Counsel for Plaintiffs-Appellees*;

13. Huling, Alice C. – *Counsel for Plaintiffs-Appellees*;

14. Jindia, Shilpa – *Counsel for Plaintiffs-Appellees*;

15. Khan, Sabrina – *Counsel for Plaintiffs-Appellees*;

16. LaCour, Edmund G. Jr. – *Counsel for Defendant-Appellant*;

17. Lang, Danielle – *Counsel for Plaintiffs-Appellees*;

18. League of Women Voters of Alabama – *Plaintiff-Appellee*;

19. League of Women Voters of Ala. Education Fund – *Plaintiff-Appellee*;

20. Marshall, Steve – *Defendant-Appellant*;

21. Matheny, Justin L. – *Counsel for Amicus Curiae*;

22. McKay, Charles – *Counsel for Defendant-Appellant*;

23. Mollman, Alison – *Counsel for Plaintiffs-Appellees*;

24. Moody, Ashley – *Counsel for Amicus Curiae*;

25. Murrill, Liz – *Counsel for Amicus Curiae*;

26. Overing, Robert M. – *Counsel for Plaintiff-Appellee*;

27. Paxton, Ken – *Counsel for Amicus Curiae*;

28. Proctor, R. David – *U.S. District Court Judge*;

29. Richardson, Valencia – *Counsel for Plaintiffs-Appellees*;

30. Ross, Deuel – *Counsel for Plaintiffs-Appellees*;

31. Sheikh, Uruj – *Counsel for Plaintiffs-Appellees*;

32. Spital, Samuel – *Counsel for Plaintiffs-Appellees*;

33. Soussi, Ahmed – *Counsel for Plaintiffs-Appellees*;

34. State of Arkansas – *Amicus Curiae*;

35. State of Florida – *Amicus Curiae*;

36. State of Louisiana – *Amicus Curiae*;

37. State of Mississippi – *Amicus Curiae*;

*AL NAACP v. Marshall*, No. 24-13111

38. State of Texas – *Amicus Curiae*;

39. Stewart, Scott G. – *Counsel for Amicus Curiae*;

40. Thatte, Anuja – *Counsel for Plaintiffs-Appellees*;

41. Thedford, Reginald – *Counsel for Plaintiffs-Appellees*;

42. Unger, Jess – *Counsel for Plaintiffs-Appellees*;

43. Van De Pol, Jr., William – *Counsel for Plaintiff-Appellee ADAP*.

Respectfully submitted this 2nd day of December 2024.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Because the appeal concerns an issue of first impression for the Circuit and lies at the intersection of federal law and the historic and sovereign power of States to regulate elections, Defendant-Appellant respectfully requests oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES .................................................................... iv

INTRODUCTION ................................................................................... 1

JURISDICTION ...................................................................................... 3

ISSUE ................................................................................................. 4

STATEMENT OF THE CASE .................................................................. 4

    A.   Election Fraud, Absentee Voting, and Vulnerable Voters ....................... 4

    B.   Congress Enacted Section 208 to Protect Vulnerable Voters ................. 9

    C.   States Have Long Regulated and Restricted Voting Assistance,  Both Before and After the Adoption of Section 208 ..................................... 11

    D.   Alabama Enacts SB1 to Prohibit Absentee Ballot Application Harvesting .................................................................................... 13

    E.   Plaintiffs Sue, and the District Court Rejects All But One Claim ......... 14

SUMMARY OF ARGUMENT ................................................................. 17

STANDARD OF REVIEW .................................................................... 19

ARGUMENT ...................................................................................... 20

    I.   Section 208 Does Not Preempt SB1 ................................................ 21

        A.   Section 208's text reveals no clear and manifest purpose to preempt reasonable election laws like SB1 ................................... 23

1.  Section 208's text does not preempt laws that reasonably regulate the manner of voting assistance. ................................................................. 24

2.  Section 208's text should be read to avoid the absurd and "uncomfortable" results of the district court's interpretation. ................................................. 30

3.  Section 208's text cannot be superseded by its legislative history to preempt state law. ................................ 36

B.  SB1 does not "unduly burden" a Section 208 voter's right to choose a trustworthy assistor. ....................................................... 39

1.  Under the district court's undue burden test, complying with SB1 and §208 is not impossible. .................. 39

2.  Under the district court's undue burden test, SB1 stands as no obstacle to accomplishing §208's purposes. .................................................................. 40

C.  SB1's Submission Provision does not conflict with Section 208. ............................................................................ 48

II.  The District Court Erred in Presuming Irreparable Harm...................... 50

CONCLUSION .................................................................................. 52

CERTIFICATE OF COMPLIANCE .................................................... 53

CERTIFICATE OF SERVICE ............................................................ 54

# TABLE OF AUTHORITIES

## Cases

*Advocate Health Care Network v. Stapleton*,
  581 U.S. 468 (2017)........................................................................26

*Ala. Ass'n of Realtors v. HHS*,
  141 S. Ct. 2485 (2021)...................................................................35

*Altria Grp., Inc. v. Good*,
  555 U.S. 70 (2008)................................................................... 23, 36

*Amoco Production Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987).......................................................................51

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983).......................................................................35

*Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*,
  305 U.S. 315 (1938).......................................................................31

*Bailey v. United States*,
  516 U.S. 137 (1995).......................................................................26

*Bates v. Dow Agrosciences LLC*,
  544 U.S. 431 (2005)................................................................. 24, 36

*Boyes v. Shell Oil Prods. Co.*,
  199 F.3d 1260 (11th Cir. 2000) ......................................................19

*Brakebill v. Jaeger*,
  905 F.3d 553 (8th Cir. 2018) ..........................................................46

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021)............................................ 1, 5, 6, 9, 34, 42, 46

*Buckley v. Valeo*,
  424 U.S. 1 (1976)...........................................................................48

iv

*Burson v. Freeman,*
      504 U.S. 191 (1992)........................................................................4, 5

*Carson v. Monsanto Co.*,
      92 F.4th 980 (11th Cir. 2024) ...........................................................23

*Chamber of Com. of U.S. v. Whitting*,
      563 U.S. 582 (2011).............................................................................38

*City of Boerne v. Flores*,
      521 U.S. 507 (1997).............................................................................35

*Clapper v. Amnesty Int'l USA,*
      568 U.S. 398 (2013).............................................................................52

*Clark v. Martinez*,
      543 U.S. 371 (2005).............................................................................24

*Clingman v. Beaver*,
      544 U.S. 581 (2005).............................................................................34

*Cooper v. Brown*, No.
      68-CV-2016-900602.00 (Jefferson Cnty. Cir. Ct. Sept. 25, 2017) ......................7

*Crawford v. Marion Cnty. Election Bd.*,
      553 U.S. 181 (2008)....................................................................... 35, 42

*Delgado v. Smith*,
      861 F.2d 1489 (11th Cir. 1988) ........................................................10

*DiPietrae v. City of Philadelphia*,
      666 A.2d 1132 (Pa. Commw. Ct. 1995) ...........................................29

*DNC v. Wis. State Legislature*,
      141 S. Ct. 28 (2020)....................................................................... 34, 35

*Duncan v. Walker*,
      533 U.S. 167 (2001).............................................................................49

*Eknes-Tucker v. Gov. of Ala.*,
  80 F.4th 1205 (11th Cir. 2023) ............................................................20

*Gallardo v. Dudek*,
  963 F.3d 1167 (11th Cir. 2020) ................................................. 24, 36

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000)............................................................................44

*Gonzales v. Carhart*,
  550 U.S. 124 (2007)............................................................................40

*Gonzalez v. Gov. of Ga.*,
  978 F.3d 1266 (11th Cir. 2020) .........................................................51

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
  992 F.3d 1299 (11th Cir. 2021) ............................................ 7, 42, 47

*Griffin v. Roupas*,
  385 F.3d 1128 (7th Cir. 2004) ..........................................................5, 6

*Hall v. Hall*,
  584 U.S. 59 (2018)..............................................................................48

*Henry v. Attorney General, Alabama*,
  45 F.4th 1272 (11th Cir. 2022) ......................................................3, 50

*Jennings* v. *Rodriguez*,
  138 S. Ct. 830 (2018).........................................................................36

*Johnson v. Governor of State of Fla.*,
  405 F.3d 1214 (11th Cir. 2005) .........................................................36

*Kansas v. Garcia*,
  589 U.S. 191 (2020)............................................................................23

*The Ku Klux Cases*,
  110 U.S. 651 (1884).............................................................................1

*La Union Del Pueblo Entero v. Abbott,*
   2024 WL 4488082 (W.D. Tex. Oct. 11, 2024).....................................30

*La. Pub. Serv. Comm'n v. FCC,*
   476 U.S. 355 (1986)...........................................................................49

*Lawson-ross v. Great Lakes Higher Ed.,*
   955 F.3d 908 (11th Cir. 2020) .........................................................23

*Leage of Women Voters of Ohio v. LaRose,*
   2024 WL 3495332 (N.D. Ohio July 22, 2024)................................30

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State,*
   66 F.4th 905 (11th Cir. 2023) .............................................................8

*League of Women Voters of Fla. v. Fla. Sec'y of State,*
   81 F.4th 1328 (11th Cir. 2023) ........................................................46

*Luis v. United States,*
   578 U.S. 5 (2016)...............................................................................27

*Luna Perez v. Sturgis Pub. Sch.,*
   598 U.S. 142 (2023)...........................................................................33

*Maracich v. Spears,*
   570 U.S. 48 (2013).............................................................................33

*Marks v. Stinson,*
   19 F.3d 873 (3d Cir. 1994) ............................................. 6, 31, 33, 46

*Marrache v. Bacardi U.S.A.,*
   17 F.4th 1084 (11th Cir. 2021) ................................................. 23, 38

*McFadden v. United States,*
   576 U.S. 186 (2016)...........................................................................27

*Medtronic, Inc. v. Lohr,*
   518 U.S. 470 (1996)...........................................................................29

*Memphis A. Philip Randolph Institute v. Hargett*,
    978 F.3d 378 (6th Cir. 2020) ............................................................... 5

*Merck Sharp & Dohme Corp. v. Albrecht*,
    587 U.S. 299 (2019) ............................................................................ 39

*Morris v. Fortson*,
    261 F. Supp. 538 (N.D. Ga. 1966) ...................................................... 28

*MSP Recovery Claims, Series LLC v. United Auto. Ins. Co.*,
    60 F.4th 1314 (11th Cir. 2023) ........................................................... 39

*N.J. Payphone Ass'n v. Town of W. N.Y.*,
    299 F.3d 235 (3d Cir. 2002) ............................................................... 35

*Nat'l Ass'n of State Util. Consumer Advocs. v. FCC*,
    457 F.3d 1238 (11th Cir. 2006) ........................................................... 23

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,
    513 U.S. 251 (1995) ............................................................................ 28

*NLRB v. SW Gen., Inc.*,
    580 U.S. 288 (2017) ............................................................................ 28

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
    557 U.S. 193 (2009) ............................................................................ 36

*Ortiz v. City of Phila. Off. of the City Comm'rs*,
    28 F.3d 306 (3d Cir. 1994) ................................................................... 5

*Pabey v. Pastrick*,
    816 N.E.2d 1138 (Ind. 2004) ............................................................... 8

*Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*,
    461 U.S. 190 (1983) ....................................................................... 23, 39

*Planned Parenthood of In. & Ky. v. Comm'r of In. State Dep't of Health*,
    896 F.3d 809 (7th Cir. 2018) ............................................................... 42

*Porter v. Alexander*,
No. 68-CV-2018-900776.00 (Jefferson Cnty. Cir. Ct. Sept. 3, 2021) ................8

*Priorities USA v. Nessel*,
487 F. Supp. 3d 599 (E.D. Mich. 2020) *rev'd in part on other grounds*,
860 F. App'x 419 (6th Cir. 2021) ............................................................... 29, 44

*Priorities USA v. Nessel*,
628 F. Supp. 3d 716 (E.D. Mich. 2022) ..................................................... 29, 30

*Purcell v. Gonzalez*,
549 U.S. 1 (2006).................................................................................................20

*Qualkinbush v. Skubisz*,
826 N.E.2d 1181 (Ill. App. Ct. 2004) .................................. 1, 6, 7, 29, 32, 33, 46

*Ray v. Texas*,
2008 WL 3457021 (E.D. Tex. Aug. 7, 2008) .....................................................29

*Rice v. Norman Williams Co.*,
458 U.S. 654 (1982).............................................................................................39

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) ..........................................................................51

*Sikkelee v. Precision Airmotive Corp.*,
822 F.3d 680 (3d Cir. 2016) ...............................................................................37

*State v. Jackson*,
811 N.E. 2d 68 (Ohio 2004) .................................................................................8

*State v. Melton*,
No. 38-CC-2017-1469 & -1467 (Houston Cnty. Cir. Ct. Jan. 16, 2019) ............8

*Straughter v. Collins*,
819 So. 2d 1244 (Miss. 2002)...............................................................................8

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997)............................................................................................36

ix

*Turkiye Halk Bankasi A.S. v. United States*,
    598 U.S. 264 (2023)................................................................34

*U.S. Smokeless Tobacco Mfg. Co. v. City of New York*,
    708 F.3d 428 (2d Cir. 2013) ............................................37

*United States v. Alabama*,
    778 F.3d 926 (11th Cir. 2015) .........................................26

*United States v. Gonzales*,
    520 U.S. 1 (1997).............................................................26

*United States v. Hansen*,
    599 U.S. 762 (2023).........................................................36

*United States v. Odom*,
    736 F.2d 104 (4th Cir. 1984) .............................................8

*United States v. Proffit*,
    304 F.3d 1001 (10th Cir. 2002) .........................................8

*United States v. Smith*,
    231 F.3d 800 (11th Cir. 2000) ...........................................7

*United Transp. Union v. Foster*,
    205 F.3d 851 (5th Cir. 2000) ...........................................42

*Va. Uranium, Inc. v. Warren*,
    587 U.S. 761 (2019)......................................... 21, 35, 38

*Wachovia Bank, N.A. v. United States*,
    455 F.3d 1261 (11th Cir. 2006) .......................................49

*Wheat v. United States*,
    486 U.S. 153 (1988).........................................................27

*White Buffalo Ventures v. Univ. of Tex. at Austin*,
    420 F.3d 366 (5th Cir. 2005) ................................. 19, 37

*Whitman v. American Trucking Assns.*, Inc.,
   531 U.S. 457 (2001)......................................................................34

*Winter v. NRDC*,
   555 U.S. 7 (2008).........................................................................51

*Womack v. Foster*,
   8 S.W.3d 854 (Ark. 2000)...............................................................9

*Wyeth v. Levine*,
   555 U.S. 555 (2009)........................................................ 20, 36, 38

**Statutes**

28 U.S.C. §1291(a)(1)........................................................................3

28 U.S.C. §1331 ...............................................................................3

52 U.S.C. §10310(c)(1)....................................................................49

52 U.S.C. §10508................................. 1, 2, 4, 10, 21, 22, 26, 27, 29, 32, 34, 37, 49

ALA. CODE §17-11-4 ........................................................................13

ALA. CODE §17-11-4(b)(2)........................................................ 14, 15, 20

ALA. CODE §17-11-4(c)(2)............................................................ 14, 48

ALA. CODE §17-11-4(d) ............................................................... 43, 44

ALA. CODE §17-11-4(d)(1)-(2)...................................................... 14, 20

ALA. CODE §17-11-4(e) ............................... 3, 4, 19, 40, 43, 48, 49, 52

Act of Feb. 21, 1980, §1-7-108, 1980 Colo. Sess. 293, 357 (Hein) ....................... 12

DEL. STAT. Title 15 §7550 ...............................................................33

AR. CODE ANN. §7-5-310(b)(4)(C)....................................................13

DEL. STAT. Title 15 §7557(b)(9)....................................................... 12, 33

GA. CODE ANN. §21-2-385................................................................ 13, 33

HAW. REV. STAT. §11-139 ....................................................................33

HAW. REV. STAT. §15-6 ................................................................... 13, 33

10 ILL. COMP. STAT. §5/19-5............................................................ 13, 33

IOWA CODE §49.90...............................................................................13

KY STAT. §117.255...............................................................................13

KY. STAT. §117.255...............................................................................34

LA. REV. STAT. §564(B)(1) ...................................................................13

Act of Aug. 5, 1976, §18:564, 1976 La. Sess. 1779, 1874 (Hein) .........12

Act of Aug. 5, 1976, §18:1310, 1976 La. Sess. 1779, 1874 (Hein) ........12

MD. ELEC. CODE §9-307 ......................................................................13

MISS. CODE ANN. §23-15-631..............................................................13

MISS. CODE ANN. §23-15-907..............................................................33

MN. STAT. §204C.15 .............................................................................12

MO. STAT. §115.445(3) .........................................................................13

1982 N.C. Gen. Stat. §163-152(a) (repealed 2002)...............................12

N.D. CENT. CODE §16.1-07-08.......................................................... 13, 33

N.H. REV. STAT. §657:17 .................................................................. 13, 34

N.H. REV. STAT. §657:17(III) ...............................................................13

N.M. STAT. ANN. §1-12-15(A) ...................................................................13

OHIO REV. CODE ANN. §3505.24 ...............................................................13

Act of May 27, 1977, §3509.08, 1977 Ohio Sess. 30, 63 (Hein) .......................9, 28

Pub. L. No. 97-205, 96 Stat. 131, 135 (1982)...........................................10

TENN. CODE ANN. §2-7-116(d) .................................................................13

TENN. STAT. §2-6-105 .............................................................................33

TENN. STAT. §2-6-207 .............................................................................33

TENN. STAT. §2-7-116 .............................................................................33

UTAH CODE ANN. §20A-3a-208.......................................................... 13, 34

UTAH CODE ANN. §20A-3a-208(2)(d) ....................................................13

W. VA. CODE §3-3-4 ..............................................................................34

W. VA. STAT. §3-1-34(e)(1)(C) ...............................................................13

## Other Authorities

Armand Derfner, *Racial Discrimination and the Right to Vote*,
    26 VAND. L. REV. 523 (1973). ............................................................10

Federalist No. 59 ...................................................................................34

Report of the Comm'n on Fed. Election Reform, Building Confidence in U.S.
    Elections (Sept. 2005)......................................................... 5, 9, 46, 47

SCALIA & GARNER, *Reading Law* (2012)........................................ 28, 31, 49

S. Rep. No. 97-417 (1982)................................9-11, 22, 28, 35, 38, 41, 42

*Webster's Third New Int'l Dictionary* (1976)...........................................26

# INTRODUCTION

Any "government whose essential character is republican … must have the power to protect the elections on which its existence depends from violence and corruption."[1] The need for protections is perhaps most pronounced for absentee voting because those voting "at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation."[2]  In many cases, self-interested operatives have "targeted the sick, the infirm and the confused" in an attempt to "manipulate their votes."[3]

Thus, many States have longstanding, and rather obvious, regulations regarding who can provide assistance to voters. Some States bar candidates or their campaigns from helping disabled or illiterate voters cast their vote; others place a limit on the number of absentee ballots any particular assistor can handle. And after Alabama suffered numerous instances of absentee ballot fraud, the State responded with SB1, which seeks to protect voters from self-interested ballot harvesters by banning the buying or selling of absentee ballot application assistance.

The main question presented here is whether Section 208 of the Voting Rights Act clearly preempts that law. It does not. Section 208 was added to the VRA in response to state laws that left disabled and illiterate voters with no choice for voting

---

[1] *The Ku Klux Cases*, 110 U.S. 651, 657-58 (1884).
[2] *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 685 (2021).
[3] *Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1190 (Ill. App. 2004)

1

assistance other than state officials who might intimidate or manipulate them. The law provides: "*Any* voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by *a* person of the voter's choice …." 52 U.S.C. §10508 (emphasis added). Plaintiffs argued that "a person of the voter's choice," meant "any person of the voter's choice," even though this reading led to admittedly "uncomfortable results." The district court deemed the statute "ambiguous," recognizing that the statute did not clearly preempt laws that keep candidates and fraudsters from "assisting" vulnerable voters. But instead of recognizing that this ambiguity doomed Plaintiffs' preemption claim, the court purported to find in legislative history the clear indication needed to supplant traditional state authority over elections. The court then facially enjoined SB1.

That was reversible error. *First*, SB1 does not bar *any* person from assisting §208 voters; it merely prohibits people from buying or selling that assistance. State laws against bribery do not infringe the right to petition the Legislature, and this bar on compensated ballot harvesting does not infringe any §208 right.

*Second*, §208 guarantees only the right of "any voter" to choose "a person," not "any person." Had Congress meant to confer the broader right—with all its "uncomfortable" consequences—it would have used the word "any" twice in that sentence, not just once. Congress did not mean to override longstanding protections

2

for vulnerable absentee voters. Indeed, doing so would undermine the core purpose of §208 by subjecting vulnerable voters to the predations of fraudsters.

*Finally*, the district court held that SB1's general requirement that voters submit their own absentee ballot applications was preempted by §208. But there is no conflict because SB1 expressly provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by an individual of the voter's choice," ALA. CODE §17-11-4(e), and the Alabama Attorney General has consistently maintained that this provision means that §208 voters who require assistance to submit their application can receive that assistance. Because courts should "uphold a state statute against a facial challenge if the statute is readily susceptible to a narrowing construction that avoids constitutional infirmities,"[4] the preliminary injunction should be reversed.

## JURISDICTION

This district court had jurisdiction under 28 U.S.C. §1331 because Plaintiffs challenge an Alabama statute as facially preempted by federal law. This Court has jurisdiction under 28 U.S.C. §1291(a)(1) because Defendant appeals from an order granting a preliminary injunction. The district court entered that order on September 24, 2024, Doc. 76, and Defendant appealed the same day, Doc. 77.

---

[4] *Henry v. Attorney General, Alabama*, 45 F.4th 1272, 1292 (11th Cir. 2022).

## ISSUES PRESENTED

1)      Section 208 of the Voting Rights Act protects the right of blind, disabled, and illiterate voters to choose a trustworthy person to assist them with voting. Alabama's SB1 protects the same right of those voters. To advance the goal of protecting vulnerable voters from manipulation and intimidation, and broadly to deter fraud, SB1 bars buying or selling certain types of absentee ballot application "assistance." Does that Compensation Provision irreconcilably conflict with §208?

2)      SB1 generally requires voters to submit their own absentee ballot applications, but expressly provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by an individual of the voter's choice." ALA. CODE §17-11-4(e). Does that Submission Provision irreconcilably conflict with §208?

3)      Did the district court abuse its discretion in presuming that Plaintiffs would be irreparably harmed by SB1?

## STATEMENT OF THE CASE

### A.    Election Fraud, Absentee Voting, and Vulnerable Voters

"[A]n examination of the history of election regulation in this country reveals a persistent battle against two evils: voter intimidation and election fraud." *Burson v. Freeman*, 504 U.S. 191, 206 (1992) (plurality op.). During the nineteenth century, "party ticket peddlers" transformed the American polling booth into "an open

4

auction place." *Id.* at 202. Ballot brokers placed the preferred "ballot in the hands of the bribed voter," and partisans "frequently" attempted "to keep away elderly and timid voters of the opposition." *Id.* at 201-02. Eventually, "all 50 States" concluded "that some restricted zone" around physical polling locations was "necessary to serve the States' compelling interests in preventing voter intimidation and election fraud." *Id.* at 206.

While State laws removed ballot peddlers from polling locations, fraudsters remained active. *See e.g.*, *Ortiz v. City of Phila. Off. of the City Comm'rs*, 28 F.3d 306, 317 (3d Cir. 1994) ("Even the dissent acknowledges that electoral fraud has been a part of Philadelphia's landscape for over 100 years."). "Voting fraud is a serious problem in U.S. elections generally[,] … and it is facilitated by absentee voting." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004). Voting by mail increases the opportunity for fraudulent submissions because "the identity of a person who votes by mail cannot be verified as easily as someone who votes in person." *Memphis A. Philip Randolph Institute v. Hargett*, 978 F.3d 378, 382 (6th Cir. 2020). As noted in the landmark study of U.S. elections by President Jimmy Carter and Secretary of State James Baker, "Vote buying schemes are far more difficult to detect when citizens vote by mail." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 685 (2021) (quoting Report of the Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections 46 (Sept. 2005)). Among the differences

5

between election-day voting and mail-in absentee ballots is that the latter are not cast from secure, monitored polling locations. Those voting "at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation." *Id.* "In this respect absentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin*, 385 F.3d at 1131.

"The integrity of the election process" can be undermined by "massive absentee ballot fraud." *Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994). In one case, for example, a candidate's campaign staff misrepresented to voters that absentee voting could be done "as a matter of convenience" and instructed voters to lie on their applications. *Id*. at 877. The operatives "were paid $1.00 for each application or ballot that they were able to obtain in this way." *Id*. After collecting the applications, the ballot harvesters delivered "absentee ballots directly to applicants' homes" and "instructed the voter to check certain places on the ballot." *Id*. All told, "the wrongdoing was substantial," "*could* have affected the outcome of the election," and at least "rendered the certified vote count an unreliable indicator of the will of the electorate." *Id*. at 886.

In another case, a mayoral candidate used an "absentee voter campaign" with "deliberate, intentional, and aggressive practices to assure the votes of handicapped voters." *Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1190 (Ill. App. Ct. 2004). The scheme began by "taking absentee ballot applications to voters, helping fill them out,

placing applications in envelopes, providing stamps to voters, and mailing applications." *Id*. at 1188. A campaign staffer encouraged voters to call him once they received the ballot "to assure that he provided assistance to the voters during the voting process itself." *Id*. at 1190. Targeting "the sick, the infirm and the confused," he "had the opportunity to tamper with the ballots while assisting the voter in voting" and "when he assumed custody of the ballot" to deliver it. *Id*. The trial court excluded thirty-eight votes from the candidate's vote total, and the second-place candidate was declared the winner. *Id*. at 1207.

Alabama too has witnessed "well-documented and public cases of voter fraud." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1323 (11th Cir. 2021); *see generally*, Doc. 42 at 7-10 (collecting examples of voter fraud in Alabama). "One investigation" into voter fraud "revealed that there were people at the polls on election day with a list of voters whose ballots had been fraudulently cast and they would chase away these voters when they came to the polls to cast their ballots." *GBM*, 992 F.3d at 1305. Other investigations resulted in criminal convictions for fraudulent handling of absentee ballot applications. *See, e.g.*, *United States v. Smith*, 231 F.3d 800, 805 n.2, 822 (11th Cir. 2000). More recently, a mayoral election in Brighton, Alabama,[5] and a city council election in

---

[5] *See* Final Order, *Cooper v. Brown*, No. 68-CV-2016-900602.00 (Jefferson Cnty. Cir. Ct. Sept. 25, 2017) (Doc. 246).

Bessemer[6] were overturned due to absentee ballot fraud, and the Mayor of Gordon, Alabama, was convicted for falsely notarizing absentee ballots without the voter present.[7]

As a general matter, "perpetrators of fraud routinely target vulnerable individuals," *United States v. Proffit*, 304 F.3d 1001, 1006-07 (10th Cir. 2002), such as "persons of advanced years, feeble both physically and mentally." *United States v. Odom*, 736 F.2d 104, 106 (4th Cir. 1984) (describing vote theft scheme). "[P]hysically infirm" voters may be unable to stop their assistors from "marking the ballots contrary to" their "intentions." *State v. Jackson*, 811 N.E. 2d 68, 70 (Ohio 2004). In the hands of self-interested operatives, mailed ballots facilitate "predation in which … the infirm and the needy [are] subject to … unscrupulous election tactics." *Pabey v. Pastrick*, 816 N.E.2d 1138, 1146 (Ind. 2004). *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 926 (11th Cir. 2023) (recounting evidence of "a 'ballot broker' who pleaded guilty to absentee-ballot fraud charges after she allegedly exploited hundreds of elderly Hispanic voters").

Votes cast unlawfully on behalf of illiterate or disabled voters can swing a close election. *See, e.g.*, *Straughter v. Collins*, 819 So. 2d 1244, 1253 (Miss. 2002).

---

[6] *See* Final Order on Election Contest, *Porter v. Alexander*, No. 68-CV-2018-900776.00 (Jefferson Cnty. Cir. Ct. Sept. 3, 2021) (Doc. 294).

[7] *See State v. Melton*, No. 38-CC-2017-1469 & -1467 (Houston Cnty. Cir. Ct. Jan. 16, 2019).

Where there is "widespread … abuse" but no prospect of a reliable recount, reviewing courts are left to "hope that the next election" will reflect "the choice of the voter, not some vote hustler." *Womack v. Foster*, 8 S.W.3d 854, 876 (Ark. 2000).

Unsurprisingly, the Supreme Court has recognized that "[l]imiting the classes of persons who handle early ballots to those less likely to have ulterior motives deters potential fraud and improves voter confidence." *Brnovich*, 594 U.S. at 685. And due to the higher risk of fraud accompanying payment schemes for registration and balloting activity (and how difficult the fraud is "to detect when citizens vote by mail"), the Carter-Baker Report recommended that "[a]ll states" outright "prohibit[] 'third-party' organizations, candidates, and political party activists from handling absentee ballots." Building Confidence in U.S. Elections 46-47. The report likewise advised all states to "consider passing legislation that attempts to minimize the fraud that has resulted from 'payment by the piece' to anyone in exchange for their efforts in voter registration, absentee ballot, or signature collection." *Id.* at 47.

**B.    Congress Enacted Section 208 to Protect Vulnerable Voters.**

In 1982, "all States" provided "some form of voting assistance for handicapped voters," but some States authorized only election officials to provide that necessary assistance. S. Rep. No. 97-417, at 63 (1982); *see, e.g.*, Act of May 27, 1977, §3509.08, 1977 Ohio Sess. 30, 63 (Hein). Such limitations could "discourage

many from voting for fear of intimidation or lack of privacy."[8] S. Rep. 97-417, at 62 n.207. And other States "prohibited *any* assistance from being given to illiterates." Derfner, 26 VAND. L. REV. at 565 (emphasis added); *see also* S. Rep. 97-417 at 63 n.209.

Congress responded by amending the Voting Rights Act to protect "the blind and disabled, and others who may be unable to cast their vote without help." *Delgado v. Smith*, 861 F.2d 1489, 1492 (11th Cir. 1988). These amendments included §208, which provides:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

Pub. L. No. 97-205, 96 Stat. 131, 135 (1982) (codified at 52 U.S.C. §10508). As some voters already had the ability to receive assistance under state law, §208 expanded such protections to "any voter who requires assistance" due to blindness, disability, or illiteracy. *Id.* And because some voters could receive assistance only from state officials, §208 allowed "assistance by a person of the voter's choice." *Id.*

---

[8] One witness who testified before the Senate Judiciary Committee had earlier explained elsewhere: "The chilling effect on a black illiterate voter of being assisted by a white election official can be significant. The black voter faces the prospect of revealing his vote to an unfamiliar or hostile white person without having assurance that his vote will be cast as he directs. Faced with this prospect, many illiterate voters have forfeited their votes by staying home or by spoiling their ballots in vain attempts to cast them without assistance." Armand Derfner, *Racial Discrimination and the Right to Vote*, 26 VAND. L. REV. 523, 564 n.171 (1973).

Indeed, the Senate Judiciary Committee report acknowledged that "many states already provide[d] for assistance by a person of the voter's choice," so §208 simply "conform[ed] to the pattern already in use in many states." S. Rep. 97-417 at 63-64.

The Senate report found that "the blind, the disabled, and those who either do not have a written language or who are unable to read or write" need assistance to exercise their right to vote. *Id*. at 62. At the same time, the report acknowledged that these same citizens are "more susceptible than the ordinary voter to having their vote unduly influenced or manipulated." *Id.* Thus, "the manner of providing assistance has a significant effect on the free exercise of the right to vote." *Id*. The report concluded that a covered voter must be allowed "to bring into the voting booth a person whom the voter trusts and who cannot intimidate him." *Id.* For these reasons, §208 protects the "right to choose a trustworthy assistant" but leaves intact the State's authority "to establish necessary election procedures … to protect the rights of voters" from undue influence or manipulation. *Id*. at 63-64.

### C.    States Have Long Regulated and Restricted Voting Assistance, Both Before and After the Adoption of Section 208.

Congress enacted §208 against a regulatory backdrop that included reasonable regulations on the right to assistance. The "pattern" of state practice on which §208 was modeled included certain restrictions on assistance based on, e.g., whether the voter would vote in person or absentee, whether the assistor had any relationship to the voter, and whether the assistor had already given assistance to someone else.

Louisiana gave the voter wide discretion to pick an assistor when voting in-person on election day. *See* Act of Aug. 5, 1976, §18:564, 1976 La. Sess. 1779, 1874 (Hein). But when voting absentee, a voter needed to choose "a spouse or blood relative," if available. *Id.* §18:1310. North Carolina had a similar scheme under which covered voters could seek "assistance from a near relative" or, if no family were available, a "voter of the precinct who ha[d] not given aid to another voter" in the same election. 1982 N.C. Gen. Stat. §163-152(a) (repealed 2002). Colorado also prohibited the assistance of "more than one voter" in a given election. Act of Feb. 21, 1980, §1-7-108, 1980 Colo. Sess. 293, 357 (Hein).

Today, notwithstanding §208, States bar assistance by certain categories of people who may exert undue influence over the voter. Some States enumerate multiple categories of prohibited assistors. For instance, Delaware prohibits "[1] the voter's employer, [2] agent of that voter's employer or union, or [3] an elected official of the municipality, [4] a candidate on the ballot, or [5] a person associated in any way with the campaign of a candidate on the ballot." DEL. STAT. Title 15 §7557(b)(9). Other States are more relaxed. For instance, Minnesota permits assistance from "any individual" except "[o]nly" those persons listed as disqualified in §208 itself. MN. STAT. §204C.15.

Certain restrictions regularly appear in State statutes. Perhaps most common is the prohibition on candidates for election from helping blind, illiterate, or disabled

voters fill out their ballots. *See, e.g.*, AR. CODE ANN. §7-5-310(b)(4)(C); GA. CODE ANN. §21-2-385; HAW. REV. STAT. §15-6; 10 ILL. COMP. STAT. §5/19-5; IOWA CODE §49.90; KY STAT. §117.255; LA. REV. STAT. §564(B)(1); MD. ELEC. CODE §9-307; MISS. CODE ANN. §23-15-631; N.D. CENT. CODE §16.1-07-08; N.M. STAT. ANN. §1-12-15(A); OHIO REV. CODE ANN. §3505.24; UTAH CODE ANN. §20A-3a-208(2)(d); W. VA. STAT. §3-1-34(e)(1)(C).

Another is that the same person cannot assist multiple voters. *See, e.g.*, MO. STAT. §115.445(3) (no "more than one voter at one election"); N.H. REV. STAT. §657:17(III) (no "more than 4 absentee ballots in any election"). Some States give greater license to a voter's family members. *See, e.g.*, MO. STAT. §115.445(3) (permitting a person to assist more than one voter for "members of such voters' immediate families"). And some States identify people who are uniquely untrustworthy when it comes to providing voter assistance. Tennessee, for example, provides that "a person convicted of voter fraud in any state shall not assist a person in casting a vote." TENN. CODE ANN. §2-7-116(d).

### D.    Alabama Enacts SB1 to Prohibit Absentee Ballot Application Harvesting.

On March 20, 2024, Governor Kay Ivey signed Senate Bill 1 into law (codified at ALA. CODE §17-11-4) to protect the integrity of absentee voting in Alabama. Three provisions are pertinent to this appeal. It is unlawful: (1) "for an individual to submit a completed absentee ballot application … other than his or her

own," *id.* §17-11-4(c)(2) ("Submission Provision"); (2) "for any person to knowingly distribute an absentee ballot application to a voter that is prefilled with the voter's name or any other information required on the application form," *id.* §17-11-4(b)(2) ("Prefilling Provision"); or (3) "for a third party to knowingly receive a payment or gift" (or "for a person to knowingly pay or provide a gift") "for distributing, ordering, requesting, collecting, completing, prefilling, obtaining, or delivering a voter's absentee ballot application," *id.* §17-11-4(d)(1)-(2) ("Compensation Provision").

SB1 expressly accommodates §208 voters by including the same language found in the federal statute: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by an individual of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." *Id.* §17-11-4(e).

### E.      Plaintiffs Sue, and the District Court Rejects All But One Claim.

On April 4, 2024, the League of Women Voters of Alabama, Greater Birmingham Ministries, the Alabama NAACP, and the Alabama Disabilities Assistance Program ("ADAP") brought six claims alleging SB1's prohibitions were unconstitutional and preempted by federal law. Doc. 1. On May 2, 2024, Plaintiffs sought a preliminary injunction on all counts, Doc. 34, and Defendant then moved

to dismiss, Doc. 42. After a hearing, Doc. 62, the district court dismissed with prejudice five of the six counts for failure to state a claim, Doc. 69.

In its order on the motion to dismiss, the district court held that Plaintiffs' claim under §208 could proceed except as to the Prefiled-Application Provision, ALA. CODE §17-11-4(b)(2). *Id.* at 64. With respect to that provision, the court recognized that the prohibition on prefilling absentee ballot applications "survives … preemption" as an exercise of the State's historic right "to establish necessary election procedures" and "to protect the rights of voters by avoiding the perceived problems of ballot harvesting, *i.e.*, potential inaccuracy or manipulation that could occur when prefilled ballots are used." *Id.* at 53 (quotation omitted).

In opposition to the preliminary injunction motion, Defendant Marshall submitted four declarations by three election officials and one retired prosecutor, as well as certain data on disability rates in Alabama. Doc. 73. Plaintiffs submitted declarations from four physically disabled voters and one paid ADAP employee. Doc. 74. Of the four voters, one wished to be assisted by her mother (Doc. 74-3 ¶6), two by their next-door neighbor (Docs. 74-1 & 74-2 ¶6), and the fourth identified ADAP itself, not an individual within the organization, as his preferred assistor (Doc. 74-4 ¶5). All four have past or current healthcare assistants, *e.g.*, Doc. 74-4 ¶3, whom the voters refuse to ask for voting help. They worry that because their

caregivers are paid for their work as caregivers, they could be liable under SB1. *See e.g.*, Doc. 74-1 ¶8.

On September 24, 2024, the district court preliminarily enjoined enforcement of the Submission and Compensation provisions "as to blind, disabled, or illiterate voters … who request assistance from a person of that voter's choice." Doc. 76 at 14 (paraphrasing §208). The court's merits analysis turned entirely on whether §208 preempts SB1, which "is a question of law." *Id.* at 3. To begin, the court had already decided in its motion to dismiss order that the "presumption against preemption" does not "hold[]" despite that election regulation is an "area[] of traditional state responsibility." Doc. 69 at 49 (cleaned up). Unconvinced that the text even *has* a "plain meaning," *id.* at 51, the district court found "the key language of Section 208, 'a person of the voter's choice,' … ambiguous," Doc. 76 at 4. Nonetheless, the court "looked to the legislative history," *id.*, and in particular the views of the Senate Judiciary Committee, to identify a "clear statement" of Congress's intent to preempt state law, Doc. 69 at 49. The 1982 Senate report stated that State laws should be preempted "to the extent that they *unduly burden* the right recognized in [§208], with that determination being a practical one dependent upon the facts." *Id.* at 52. Then, without an evidentiary hearing, the district court determined that SB1 was facially preempted on the ground that it "unduly burdens the rights of Section 208 voters to

make a choice about who may assist them in obtaining and returning an absentee ballot." Doc. 76 at 4. Defendant Marshall timely appealed. Doc. 80.

## SUMMARY OF ARGUMENT

The district court erred when it interpreted Section 208 to preempt Alabama's efforts to define what types of absentee ballot application assistance are permitted.

**I.A.** The district court misapplied the Supreme Court's preemption framework when it dispatched the presumption against preemption and identified a conflict between the federal statute and state law based solely on legislative history. §208 does no violence to state laws like SB1 that articulate permissible and unlawful methods of providing voting assistance.

Section 208's text, incorporated into SB1, authorizes necessary voting assistance from "a person of the voter's choice," without throwing open the door to paid assistance by ballot harvesters. The "voter's choice" can clearly be circumscribed without undermining the "right to choose" because §208 already forbids assistance by "the voter's employer or agent of that employer or officer or agent of the voter's union."

Likewise, States can (and do) limit the universe of potential assistors by excluding people convicted of voter fraud, candidates who are on the ballot, campaign officials, and paid ballot harvesters. The alternative view—the district court's view—requires an implausible, totalizing approach to the phrase "voter's

17

choice" to include literally anyone who is not mentioned by §208 and any and all types of voter assistance. Plaintiffs themselves recognized that their interpretation would produce, in their words, "uncomfortable results." Doc. 62 at 124:1-2, 23-24. Indeed, candidates themselves, foreign operatives, and even convicted vote stealers would be free to join blind voters in the voting booth or walk the halls of nursing homes to offer "assistance." The idea that States must let *anyone* handle absentee ballot applications for §208 voters is absurd, an invitation to fraud, and a deep intrusion on the traditional state power to regulate elections. Such "uncomfortable results" were never intended by the 1982 Congress and would raise serious constitutional questions about Congress's authority to abolish commonsense protections for state elections. Fortunately, these results are easily avoided by faithful application of the Supreme Court's preemption framework, which reveals no conflict between two laws designed to protect §208 voters in complementary ways.

**I.B.** Even if it were correct to fashion a test for preemption based on legislative history, the district court still erred in application of that test. Under that standard, §208 voters are protected against undue burdens on their right to choose a trustworthy assistor, not against reasonable limitations on that right. The district court merely identified a burden, but because that burden is light and the State's interests are weighty, that burden is not undue.

**I.C.** The district court also erred by holding SB1's Submission Provision preempted by §208. Although SB1's Submission Provision generally prohibits submitting someone else's absentee ballot application, SB1 also specifically provides at §17-11-4(e) that §208 voters may receive required assistance to vote, which includes assistance in submitting their application. The district court rejected this harmonious reading, rendering §17-11-4(e) a dead letter en route to erroneously concluding that SB1 bars even quadriplegic voters from securing help from friends or family to submit their application.

**II.** Finally, the district court entered an injunction in the absence of any irreparable harm likely to befall Plaintiffs. The court never found that *any* §208 voter was unable to receive voting assistance from a trustworthy person of his or her choice, or, crucially, that any §208 voter would likely be unable to vote under SB1.

## STANDARD OF REVIEW

"Although the standard of review is abuse of discretion" for an appeal of a preliminary injunction, here "it amounts to de novo review[] because the case turns on a purely legal issue of preemption and [the Court] decide[s] such issues de novo." *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1266 n.13 (11th Cir. 2000); *see also White Buffalo Ventures v. Univ. of Tex. at Austin*, 420 F.3d 366, 370 (5th Cir. 2005). Further, a district court can abuse its discretion "if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper

19

procedures in making a determination, or makes findings of fact that are clearly erroneous." *Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205, 1219 (11th Cir. 2023).

## ARGUMENT

"SB1 was enacted to prevent absentee ballot fraud," Doc. 69 at 2, and a "State indisputably has a compelling interest in preserving the integrity of its election process," *id.* (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). In particular, SB1 secures Alabama elections against fraud by regulating the ways in which third parties can interact with potential absentee voters. Under the Prefilling Provision, it is illegal to distribute an absentee ballot application that already has the voter's name or other information filled out. ALA. CODE §17-11-4(b)(2). Under the Submission Provision, voters generally must submit their own applications. *Id*. §17-11-4-(c)(2). And under the Compensation Provisions, no one can pay or receive payment for harvesting absentee ballot applications. *Id*. §17-11-4(d)(1)-(2).

Section 208 does not foreclose such reasonable election integrity laws. Preemption requires a conflict. Here, it is not impossible to comply with both laws, nor does SB1 pose an obstacle to the purposes and objectives of §208. The district court improperly invoked legislative history to overcome the "assumption that the historic police powers of the States [a]re not to be superseded." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). But as the Supreme Court has cautioned, "abstract and

unenacted legislative desires" cannot support preemption of state law. *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (lead op.).

Not only did the district court misapply preemption doctrine, it misread §208 to mean that a voter can choose *any person* under the sun to assist with his or her application. Under that limitless approach, political candidates, paid operatives, and even convicted fraudsters would enjoy federally mandated access to blind, disabled, and illiterate voters. Experience confirms that many of those vulnerable voters will be manipulated or intimidated out of their vote by self-interested actors. Giving federal law such an implausibly broad scope would wipe out many longstanding commonsense protections for voters across the country. And instead of facilitating Congress's goal of affording §208 voters the protection of a trustworthy assistor, it would leave them more vulnerable to manipulation.

Even if the district court were right to find a preemption test in the legislative history, it misapplied that test here when it held as a matter of law that SB1 unduly burdens the §208 right. And it should not have entered an injunction without any proof of hardship, let alone irreparable harm, imposed on any voter because he or she cannot receive *paid* assistance in connection with an absentee ballot application.

## I.    Section 208 Does Not Preempt SB1.

Section 208 of the Voting Rights Act states: "Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may

21

be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. §10508. Put simply, *any* §208 voter who needs help to vote has the "right to choose *a* trustworthy assistant." S. Rep. 97-417 at 64 (emphasis added). The statutory interpretation question is whether the State can prohibit certain types of voting assistance or whether the voter has complete and unfettered discretion when choosing his preferred assistor, notwithstanding any state law to the contrary.

The district court found the text "ambiguous" yet relied upon legislative history to enjoin the Compensation and Submission Provisions of SB1 as facially preempted whenever a §208 voter requests voting assistance. SB1 is "in direct conflict with Section 208," the court concluded, because SB1 "will restrict [Plaintiffs'] ability to help Section 208 voters," thereby "unduly burden[ing] the right to an assistor of a Section 208 voter's choice." Doc. 69 at 58, 59.

The court's conclusion does not follow from the plain meaning of §208's text, which should be informed first and foremost by interpretive canons, context, and common sense derived from decades of its operation in practice—not a few words pulled from legislative history. Reasonable election laws like SB1 in fact complement §208. States can respect a §208 voter's right to choose an assistor while enhancing election integrity, mitigating the risk of fraud, and better protecting all voters, including §208 voters, from confusion, intimidation, and undue influence.

22

**A.    Section 208's text reveals no clear and manifest purpose to preempt reasonable election laws like SB1.**

The Supremacy Clause "provides 'a rule of decision' for determining whether federal or state law applies in a particular situation." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). "[W]here a federal law and a state law conflict, federal law trumps state law." *Marrache v. Bacardi U.S.A.*, 17 F.4th 1084, 1094 (11th Cir. 2021). (citations omitted). "Congress may preempt state authority by so stating in express terms" or by crafting "a scheme of federal regulation so pervasive" as to leave States "no room to supplement it." *Pac. Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n*, 461 U.S. 190, 203-04 (1983). Neither express preemption nor field preemption is implicated here. Plaintiffs resort to *implied* preemption, which requires that the challenged state law "irreconcilably conflict" with federal law. *Carson v. Monsanto Co.*, 92 F.4th 980, 997 (11th Cir. 2024) (cleaned up).

An irreconcilable conflict does not arise "unless that is the clear and manifest purpose of Congress"—the "ultimate touchstone of preemption analysis." *Lawson-ross v. Great Lakes Higher Ed.*, 955 F.3d 908, 916 (11th Cir. 2020) (cleaned up). And a "clear and manifest" purpose is "determine[ed] … [by] the text and structure of the statute." *Id.* (cleaned up); *Nat'l Ass'n of State Util. Consumer Advocs. v. FCC*, 457 F.3d 1238, 1252 (11th Cir. 2006). When the text of federal law "is susceptible to more than one plausible reading," *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008), courts "have a duty to accept the reading that disfavors pre-emption," *Bates*

*v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005); *see also Gallardo v. Dudek*, 963 F.3d 1167, 1175 (11th Cir. 2020).

Here, there is no conflict between SB1 and the text of §208, let alone an irreconcilable one that reflects the clear and manifest will of Congress. Defendant offers a more than "plausible reading" of §208 that avoids casting "serious constitutional doubts" upon reasonable election laws. *Clark v. Martinez*, 543 U.S. 371, 381, 384 (2005). Yet the court below opted for an "uncomfortabl[y]" broad reading that would undermine ballot integrity efforts nationwide, Doc. 62 at 124:1-2, 23-24. Even while recognizing the complementary purposes of §208 and SB1, the court based its decision not on §208's text and structure, but on one sentence of its legislative history. The court's reasoning and result evince multiple reversible errors.

### 1. Section 208's text does not preempt laws that reasonably regulate the manner of voting assistance.

**a.** The first reason that Section 208 does not preempt SB1 is that SB1 does not bar *anyone* from providing assistance. No one is banned from assisting blind, disabled, or illiterate voters in need; individuals are simply forbidden from knowingly taking payment for handling a voter's absentee ballot application. Thus, while SB1 regulates a *form* of assistance—paid assistance—the law does not exclude any category of people from assisting. For example, Plaintiffs' Declarants Courie and McKee prefer the assistance of their longtime neighbor, who is a member of the League of Women Voters of Alabama. Docs. 74-1 ¶¶5-6, 74-2 ¶¶5-6. SB1 does not

24

prevent Courie and McKee from choosing their neighbor as their preferred assistor, nor does it prohibit the neighbor from helping those homebound voters. The law simply prohibits transforming that neighborly help into a transaction where money or gifts are exchanged for assistance.

If the neighbor refused to provide unpaid assistance, Courie and McKee's §208 right to choose an assistor would remain uninfringed. A voter may be *given* assistance; beyond that, §208 has nothing to say about regulations concerning the form of assistance. For instance, if a State required §208 voters to disclose the identity of their assistors, no voter's "right to choose" would be infringed even if his first choice turned him down due to an insistence on anonymity. In that example, a reasonable restriction on how assistance is provided does not ban any category of assistor.[9] While someone might refuse to help unless he or she could do so anonymously, the right to choose that *person* has not been violated.

The bottom line is that §208 does not confer a federal right upon a disabled voter to receive every particular *kind* of assistance the voter or would-be assistor may desire, including paid assistance. Under SB1, anyone may bring a voter an

---

[9] Of course, an unreasonable restriction on the form of assistance could effectively deprive the voter of meaningful assistance. For example, a ban on providing assistance between the hours of 6am and 6pm could very well leave a disabled voter without the opportunity to receive any meaningful assistance. But this appeal does not present any such issue. There is no proof that any voter, much less all of them, will be without assistance unless their assistors are being paid to handle their ballot applications.

absentee ballot application, but not for pay, just like anyone may petition their Legislature, but not with a bribe attached. Section 208 has no effect on state laws like SB1 that reasonably regulate how voter assistance is provided.

**b.** Yet even if SB1 were construed to bar certain persons from assisting, as opposed to the manner of assistance, §208 did not create an unfettered right to have *anyone* assist in the voting process. If Congress meant to do so, it could have written that "any voter" can choose "any person" rather than "any voter" can chose "a person." The "word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting *Webster's Third New Int'l Dictionary* 97 (1976)). But Congress wrote that "any voter" in need may be given assistance by "*a* person." 52 U.S.C. §10508 (emphasis added). The indefinite article "a" can mean "any" or "one," depending on the context. *United States v. Alabama*, 778 F.3d 926, 932 (11th Cir. 2015). Here, the "most natural reading," given the context, strongly suggests the narrower use. *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) ("[E]ach word Congress uses is there for a reason.").

While "a" can mean "any," the fact that Congress used "any" earlier in §208 when referring to voters but used "a" later in the same sentence to refer to an assistor signals an intent to give the two different words two different meanings. *See Bailey v. United States*, 516 U.S. 137, 146 (1995) (assuming "that Congress used two terms

26

because it intended each term to have a particular, nonsuperfluous meaning"). Thus, "*a* person of the voter's choice" ought to mean "some undetermined or unspecified" individual chosen by the voter, *McFadden v. United States*, 576 U.S. 186, 191 (2016), not *any* person the voter could conceivably choose, as Plaintiffs have argued, ECF 21 at 14, and as their preemption claim requires. When every word is given effect, it becomes plain that §208 affords certain voters the right to choose a person, *someone*, to help them vote, which is altogether different from throwing open the door to any and all potential assistors.

The language "right to choose" does not change the analysis. Consider that "the Sixth Amendment grants a defendant 'a fair opportunity to secure counsel *of his own choice*,'" yet that right "has limits," *Luis v. United States*, 578 U.S. 5, 11 (2016) (plurality op.) (cleaned up) (emphasis added)), and "is circumscribed in several important respects," *Wheat v. United States*, 486 U.S. 153, 169 (1988). So too here. A voter's choice cannot be unlimited as a matter of plain meaning because the statute itself takes whole categories of persons out of the picture: the voter's employer and union. *See* 52 U.S.C. §10508.

By recognizing two commonsense restrictions, Congress did not give the voter a boundless federal right. Just the opposite: Congress knew that certain people could pose a heightened risk of undue influence on vulnerable voters. That Congress did not enumerate other obvious categories—such as candidates or campaign staff

or fraudsters—does not imply a federal right to receive their assistance. Such an interpretation takes *expressio unius* to the extreme, but that canon "applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (cleaned up). Courts must exercise "great caution" when drawing such inferences, which "depend[] so much on context." SCALIA & GARNER, *Reading Law* 107 (2012). Here, context confirms that specifically naming employer and union representatives is "exemplary, not exclusive." *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995).

Thus, a state law conflicts with the plain meaning of §208 if it prevents a disabled voter from selecting *a* trustworthy assistor, not if it merely regulates voting assistance. This reading does not render §208 inert. At the time it was adopted, myriad state laws could fairly be said to leave certain voters no "choice" in the matter. At least one State allowed only state-provided assistors into the voting booth, *see, e.g.*, Act of May 27, 1977, §3509.08, 1977 Ohio Sess. 30, 63 (Hein), and others so drastically limited the number of assistors that the right was effectively null, *see, e.g.*, *Morris v. Fortson*, 261 F. Supp. 538, 540-41 (N.D. Ga. 1966). And when Congress wrote "any voter," it probably had in mind state laws like a ban on assistance for those who "could read or write [their] own name," S. Rep. 97-417 at 63. These laws may fairly fall within "the scope of [§208's] intended invalidation of

28

state law." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). But Alabama's SB1 nowhere near approaches these bygone restrictions long since rooted out by the Constitution and Voting Rights Act.

As several federal and state courts have recognized, Defendant's reading is the more plausible meaning of the text. *See, e.g.*, *Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020) (Section 208's "language suggests that some state law limitations on the identity of persons who may assist voters is permissible."), *rev'd in part on other grounds*, 860 F. App'x 419 (6th Cir. 2021); *Ray v. Texas*, 2008 WL 3457021, at *7 (E.D. Tex. Aug. 7, 2008) ("The language of Section 208 allows the voter to choose a person who will assist the voter, but it does not grant the voter the right to make that choice without limitation" nor does it "preclude all efforts by the State to regulate elections by limiting the available choices to certain individuals."); *Qualkinbush v. Skubisz*, 826 N.E.2d 1181, 1197 (Ill. App. Ct. 2004) (holding that "states may impose restrictions on those individuals who may return a disabled voter's absentee ballot"); *DiPietrae v. City of Philadelphia*, 666 A.2d 1132, 1135-36 (Pa. Commw. Ct. 1995) (upholding order barring anyone from returning absentee ballots for more than one household).

In sum, "a State law that limits a voter's choice does not automatically flout Section 208," *Priorities USA v. Nessel*, 628 F. Supp. 3d 716, 733 (E.D. Mich. 2022), particularly when it works to reduce the influence of those posing greater risks to

§208 voters. "Section 208's natural effect allows some wiggle room: a voter may select 'a person' to assist them, but not *the* person of their choice." *Id.* If SB1 can be said to restrict the set of possible assistors, it does so only as a downstream consequence of regulating assistance-buying and assistance-selling. Because illiterate and disabled voters remain free to choose a person, just not someone who is receiving payment for the assistance, SB1 and §208 do not irreconcilably conflict.

### 2. Section 208's text should be read to avoid the absurd and "uncomfortable" results of the district court's interpretation.

Plaintiffs and the district court read §208 as conveying Congress's clear and manifest purpose to establish a "fixed universe" of assistors, thereby superseding all state attempts to exclude "any" would-be assistor except for "union and employer representatives." Doc. 50 at 42, 46; Doc. 62 at 104:22, 107:1, 108:22-23, 117:7; Doc. 76 at 4-5; *see also* ECF 21 at 14.[10]

---

[10] This interpretation lines up with some recent decisions reasoning that *any law* "limiting a disabled voter's choice of facilitator is inconsistent with Section 208." *Leage of Women Voters of Ohio v. LaRose*, 2024 WL 3495332 (N.D. Ohio July 22, 2024). These decisions contain many of the same errors as the decision below, disregarding plausible readings that would uphold state law, spurning the presumption against preemption, and ignoring the absurd consequences that would follow. For example, a federal court recently enjoined several provisions of an omnibus Texas election integrity law as preempted by §208, finding in part that "voters with cognitive disabilities or memory impairments may need their assistors to remind them how they intended to vote or visually point out the voter's preferred candidate on the ballot." *La Union Del Pueblo Entero v. Abbott*, 2024 WL 4488082, at *48 (W.D. Tex. Oct. 11, 2024). "Reminding" the mentally handicapped how to vote is yet another "uncomfortable" result that is not supported, much less clearly mandated, by the text of §208.

The "textual consequences" of this expansive reading are troubling,[11] and admittedly "uncomfortable," even to Plaintiffs. Doc. 62 at 124:1-2, 23-24.[12] Under this view, §208 would preempt state laws that safeguard disabled voters from manipulation by fraudsters, foreign agents, and self-interested candidates as well as paid operatives. States would lose the best tool they have to prevent convicted fraudsters from prowling nursing homes, ready and willing to provide "assistance" as the "person of a voter's choice." So too States could not stop candidates for political office from visiting the local institute for the deaf and blind with absentee ballot applications in hand. To hamstring a State's efforts to secure elections like this sounds "glaringly absurd," but it follows directly from Plaintiffs' and the district court's reading of §208. *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 333 (1938).

And these "uncomfortable" results are far from hypothetical. In *Marks v. Stinson*, for example, a candidate's campaign staff misrepresented to voters that absentee voting could be done "as a matter of convenience" and instructed voters to

---

[11] SCALIA & GARNER, *Reading Law* 352 (listing preemption of state law as an "outcome-pertinent consequence … relevant to a sound textual decision").

[12] At the hearing on Defendant's motion to dismiss, the court asked Plaintiffs' counsel if, under their interpretation, a person convicted of voter fraud could be barred from providing voting assistance: "that wouldn't violate Section 208, would it?" Doc. 62 at 123:23-24. Plaintiffs' counsel maintained that "it could violate 208 if there was some voter out there who would have chosen that person to assist him," while proceeding to admit that this view "could create hypotheticals that become uncomfortable." *Id.* at 124:1-2, 23-24.

lie on their applications" and to check certain boxes 19 F.3d 873, 887, 889 (3d Cir. 1994). These staffers were paid "for each application or ballot they were able to obtain." *Id.* at 887. Later "[m]any voters who cast absentee ballots testified that they were unaware that they had signed absentee ballot applications." *Id.*

Similarly troubling, in *Qualkinbush v. Skubisz*, a mayoral candidate used an "absentee voter campaign" with "deliberate, intentional, and aggressive practices to assure the votes of handicapped voters." 826 N.E.2d 1181, 1190 (Ill. App. Ct. 2004). The scheme began by "taking absentee ballot applications to voters, helping fill them out, placing applications in envelopes, providing stamps to voters, and mailing applications." *Id*. at 1188. Targeting "the sick, the infirm and the confused," the campaign "had the opportunity to tamper with the ballots while assisting the voter in voting." *Id*. at 1190. The trial court excluded thirty-eight votes from the leading candidate's vote total, and the second-place candidate was declared the winner. *Id*. at 1207. On appeal, the candidate who had initially prevailed by targeting disabled voters actually argued that his ballot harvester's conduct was protected by §208, which purportedly preempted an Illinois law that limited who could handle a voter's absentee ballot. *Id*. at 1192-93. Fortunately for Illinois voters, the *Qualkinbush* court held that Illinois's law—like SB1—was "designed to protect the rights of disabled voters" and thus did "not conflict with the intent and purpose of the Voting Rights Act." *Id.*

32

The district court's reading, on the other hand, undermines §208's purpose of protecting vulnerable voters from manipulation and deception. That reading would open the door to the sort of election-stealing schemes documented in *Marks* and *Qualkinbush*. Worse still, §208 would prohibit Illinois and Pennsylvania from banning the very campaign staffers guilty of such nefarious activity from "helping" other vulnerable voters in the future. While "no law pursues its purposes at all costs," *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 150 (2023) (cleaned up), far stronger textual evidence is needed before reading §208 to so thoroughly *undermine* its ultimate goal.

The district court's interpretation, lacking a "limiting principle," calls into question not just SB1, but other ordinary election laws nationwide. *Maracich v. Spears,* 570 U.S. 48, 60 (2013). *See, e.g.*, TENN. STAT. §§2-6-105, 2-6-207, 2-7-116 (prohibiting persons convicted of fraud in any State from assisting); DEL. STAT. Title 15 §§7550, 7557 (prohibiting election officials, candidates, and candidate's campaign staff from assisting); GA. CODE ANN. §21-2-385 (prohibiting candidate and candidate's close relatives from assisting); N.D. CENT. CODE §16.1-07-08 (same); HAW. REV. STAT. §§11-139, 15-6 (prohibiting candidate from assisting); 10 ILL. COMP. STAT. §5/19-5 (same); LA. REV. STAT. §18:1309 (same); MD. ELEC. CODE §9-308 (same); N.M. STAT. §1-12-15 (same); MISS. CODE ANN. §23-15-907 (prohibiting candidates, candidate's close relatives, and poll watchers from

assisting); UTAH CODE ANN. §20A-3a-208 (same); W. VA. CODE §3-3-4 (same); KY. STAT. §117.255 (prohibiting election officials from assisting); N.H. REV. STAT. §657:17 (prohibiting "delivery agent" from delivering "more than 4 absentee ballots in any election").

If Congress in 1982 really intended to bulldoze such common means of protecting state voters, "the subject undoubtedly would have surfaced somewhere in the Act's text," for "Congress typically does not 'hide elephants in mouseholes.'" *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 274 (2023) (quoting *Whitman v. American Trucking Assns.*, Inc., 531 U.S. 457, 468 (2001)). As the Supreme Court remarked when interpreting another revision to the Voting Rights Act made in 1982, it is "doubt[ful] that Congress intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States." *Brnovich*, 594 U.S. at 670. Yet that is the unavoidable and uncomfortable result of the district court's logic.

The district court's interpretation, if adopted, would be a "*de facto* green light to federal courts to rewrite dozens of state election laws around the country." *DNC v. Wis. State Legislature*, 141 S. Ct. 28, 35 (2020) (Kavanaugh, J., concurral); *see also Clingman v. Beaver*, 544 U.S. 581, 593 (2005) (counseling to avoid reading statutes to "compel federal courts to rewrite state electoral codes."); *cf.* Federalist No. 59. This result cannot be reconciled with the Supreme Court's repeated

recognition that "evenhanded restrictions that protect the integrity and reliability of the electoral process itself" are not constitutionally suspect. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189-90 (2008) (plurality op.) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983)); *see also Wis. State Legislature*, 141 S. Ct. at 33 (Kavanaugh, J., concurral). Indeed, the constitutional dimensions of any preemption case *heighten* the need for restrained statutory interpretation. *Va. Uranium*, 587 U.S. at 773, 775-76, 778-79; *N.J. Payphone Ass'n v. Town of W. N.Y.*, 299 F.3d 235, 248-49 (3d Cir. 2002) (Alito, J., concurring). Section 208 contains no "exceedingly clear language" that would require such upheaval of the federal-state balance. *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021).

And it is doubtful that Congress would even have the authority to enact so thoroughgoing and "uncomfortable" a rewrite of laws governing state elections. *See City of Boerne v. Flores*, 521 U.S. 507, 520 (1997) ("There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."). Section 208 was enacted to fix the historical problem of some States limiting voting assistance to state officials, which could impose an undue burden. *See* S. Rep. 97-417, at 63. But there was no indication in the legislative record that the Constitution would be violated unless fraudsters and partisans could follow blind voters into the voting booth, and "[f]or Congress to enact proper enforcement legislation, there must be a record of constitutional violations." *Johnson*

35

*v. Governor of State of Fla.*, 405 F.3d 1214, 1231 (11th Cir. 2005) (en banc). Moreover, Plaintiffs have adduced no evidence that §208's "current burdens" are "justified by current needs." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009). Thus, reading §208 to override state protections for state voters and state elections would require the Court "to address whether Congress exceeded its enforcement powers under the Fourteenth and Fifteenth Amendments," raising "grave constitutional concerns." *Johnson*, 405 F.3d at 1231. Accordingly, even if Alabama's reading of §208 "were not the best one, the interpretation is at least 'fairly possible'—so the canon of constitutional avoidance would still counsel [the Court] to adopt it." *United States v. Hansen*, 599 U.S. 762, 781 (2023) (quoting *Jennings* v. *Rodriguez*, 138 S. Ct. 830, 842 (2018)).

**3.  Section 208's text cannot be superseded by its legislative history to preempt state law.**

When the text of federal law "is susceptible to more than one plausible reading," *Altria Grp*, 555 U.S. at 77, courts "have a duty to accept the reading that disfavors pre-emption," *Bates*, 544 U.S. at 449; *see also Gallardo*, 963 F.3d at 1175. That duty, *i.e.* the "presumption against preemption," "applies with particular force" when the challenged law relates to "a field traditionally occupied by the States," *Altria Grp.*, 555 U.S. at 797, like the "regulation[] of parties, elections, and ballots," *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *see also Wyeth*,

555 U.S. at 565 (referring to the presumption as a "cornerstone[] of our preemption jurisprudence").

Plaintiffs did not offer such a decisive case for their reading of the statute as would overcome the presumption against preemption, and that should have been dispositive. At best for Plaintiffs, the district court found the text "ambiguous," specifically the phrase "a person of the voter's choice," and more specifically the indefinite article "a." Doc. 76 at 4; *see also* Doc. 69 at 50, 51 n.12. To the court, whether §208 confers the right to choose "*any* person" or "*a* person" to assist is a question the text does not clearly answer. *See* Doc. 69 at 52. Because "the text does not plainly indicate how this federal statute should operate with state laws governing election procedures (like SB1)," *id.*, this preemption case should have been over. *See U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, 708 F.3d 428, 433 (2d Cir. 2013) ("[I]f there is any ambiguity as to whether the local and federal laws can coexist, we must uphold the ordinance"); *see also Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 693 (3d Cir. 2016); *White Buffalo Ventures*, 420 F.3d at 372.

Despite §208's admitted ambiguity, the district court rejected Defendant's plausible reading in favor of one based on a single sentence of the 239-page Senate report accompanying the 1982 amendments to the VRA: "State provisions would be preempted only to the extent that they unduly burden the right recognized in this section, with that determination being a practical one dependent upon the facts."

S. Rep. 97-417, at 63. Relying on this reference to preemption in the legislative history, the court decided as a matter of law that, on its face, "SB 1 unduly burdens the rights of Section 208 voters to make a choice about who may assist them in obtaining and returning an absentee ballot." Doc. 76 at 4.

The district court abused its discretion when it found a "clear and manifest purpose" to preempt state law hidden in legislative history despite the absence of a clear textual conflict. *Marrache*, 17 F.4th at 1095. The court erred again when it derived the controlling test for preemption from a sentence within that legislative history. Whatever purchase such "abstract and unenacted legislative desires" may have in other contexts, they do not support preemption of state law. *Va. Uranium*, 587 U.S. at 778 (lead op.); *see also Chamber of Com. of U.S. v. Whitting*, 563 U.S. 582, 599 (2011) ("Congress's authoritative statement is the statutory text, not the legislative history." (cleaned up)). Relying on the opinion of one committee in one body of Congress, the district court's decision undermined not only "state sovereignty" but also "Congress's authority to delimit the preemptive effect of its laws." *Va. Uranium*, 587 U.S. at 774. Whatever the views of a few legislators or their staffers, "Congress does not cavalierly pre-empt" state law. *Wyeth*, 555 U.S. at 565 n.3.

**B.    SB1 does not "unduly burden" a Section 208 voter's right to choose a trustworthy assistor.**

Even under the district court's expansive reading of §208 derived from the legislative history, there is no preemption because SB1 does not unduly burden a §208 voter's right to choose a trustworthy assistor. Compliance with both §208 and SB1 is not "a physical impossibility," and SB1 does not "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pac. Gas & Elec. Co.*, 461 U.S. at 204 (cleaned up); *see also MSP Recovery Claims, Series LLC v. United Auto. Ins. Co.*, 60 F.4th 1314, 1322 (11th Cir. 2023). Here, the district court identified at most a "hypothetical or potential conflict," which "is insufficient to warrant the pre-emption of the state statute." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).

**1.    Under the district court's undue burden test, complying with SB1 and §208 is not impossible.**

At the outset, Plaintiffs have never argued that compliance with both SB1 and §208 is impossible. Without question, §208 voters in Alabama can and do request help from unpaid assistors. *Cf. Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 314 (2019) (noting that the mere "possibility of impossibility is not enough"). If it were physically impossible for some §208 voter to comply with both laws, then the proper course would be to bring an as-applied challenge, "the basic building block[] of constitutional adjudication." *Gonzales v. Carhart*, 550 U.S. 124, 168

39

(2007). But there is no evidence that SB1 "will prohibit the vast majority" of §208 voters from receiving the assistance they need from the person of their choosing, *id.* at 156, so the district court erred by holding SB1 preempted on its face. Because myriad "[a]lternatives are available" to receiving voting assistance from a paid ballot harvester, *id.* at 165, complying with both laws is not a physical impossibility. Thus, SB1 does not actually and facially conflict with §208.

**2. Under the district court's undue burden test, SB1 stands as no obstacle to accomplishing §208's purposes.**

SB1 complements, not conflicts with, the purpose of §208: to safeguard the voting rights of blind, disabled, and illiterate voters in need of assistance by securing their ability to choose a trustworthy assistor. As explored *supra*, SB1 respects a §208 voter's right to choose an assistor while enhancing election integrity, mitigating the risk of fraud, and better protecting all voters, including §208 voters, from confusion, intimidation, and undue influence. While SB1's Compensation Provisions prohibit paid assistance, they fully empower §208 voters to choose a trustworthy assistor. And the Submission Provision poses no obstacle to §208, for there is no sound reason to read §17-11-4(e)'s exception for assisting disabled voters differently from the nearly identical language in §208, *see infra* at 52-54.

To the extent that legislative history elucidates the meaning of the text, as the district court would have it, the history demonstrates that SB1 and §208 stand in harmony. The Senate report recognized that blind, disabled, and illiterate voters are

40

"more susceptible than the ordinary voter to having their vote unduly influenced or manipulated." S. Rep. 97-417, at 62. Section 208's stated objective, then, was "to assure meaningful voting assistance and to avoid possible intimidation or manipulation of the voter." *Id.* Thus, §208 protects the "right to choose a trustworthy assistant" but leaves intact the State's authority "to establish necessary election procedures … to protect the rights of voters" from undue influence or manipulation. *Id*. at 63-64. Only state laws that "*unduly burden* the right" to choose an assistor conflict with §208, according to the report. *Id.* at 63.

Here, the district court never identified any evidence of an undue burden. Even so, any slight burden befalling §208 voters on this record is not *undue*, given the substantial and legitimate state interests advanced by SB1.

**a. No evidence of undue burden.** After adopting the undue burden test, the district court explicitly decried the need to examine any evidence of the burdens SB1 supposedly imposes on disabled voters, weighed against the legitimate interests the law advances. *See* Doc. 76 at 4 (deciding that "because preemption is a question of law, the court need only look at the legal basis for the claim"); *id.* at 9 (declaring that evidentiary submissions are "unnecessary to the court's injunctive relief determination"); *id.* at 9, 11 (finding that the burden on the right to choose is "obvious" and a matter of "common sense").

That's not how "undue burden" tests work. Whether a state law imposes an undue burden on the exercise of a federal right *always* depends on the facts. Even the district court's primary source, the Senate Judiciary report, admits as much. S. Rep. 97-417, at 63 (calling for "a practical [inquiry] dependent upon the facts"). To find an undue burden (*vel non*), courts must "consider the evidence in the record." *Planned Parenthood of In. & Ky. v. Comm'r of In. State Dep't of Health*, 896 F.3d 809, 818 (7th Cir. 2018); *see also United Transp. Union v. Foster*, 205 F.3d 851, 863 (5th Cir. 2000) (remanding in light of a "record … devoid of any evidence" of "an undue burden on interstate commerce"); *Crawford*, 553 U.S. at 202 (concluding, based on the evidentiary record, that Indiana's voter ID law did not impose "excessively burdensome requirements" on the right to vote); *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 682-85 (2021) (finding that "more concrete evidence" was required to show "a disparate burden" caused by Arizona's "out-of-precinct policy"); *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1320 (11th Cir. 2021).

The evidence presented by the parties and deemed irrelevant by the district court shows that any alleged burden imposed by SB1 is not "undue." SB1 erects no barrier for §208 voters to receive necessary assistance from people voters actually choose as helpers—*e.g.*, spouses, family members, caregivers, neighbors, nurses, and volunteers. Indeed, *anyone* can assist a §208 voter, just not in exchange for cash

42

or gifts. Remarkably, of the estimated 800,000 blind or disabled Alabamians over the age of 17, Doc. 73-5 at 5, Plaintiffs have not identified a single voter who will be unable to vote unless he or she receives the assistance of someone who is paid to handle the voter's absentee ballot application. Plaintiffs highlight the plight of their four declarants, each of whom has a ready and willing assistor, such as a personal caregiver, who is not compensated for handling "a voter's absentee ballot application." ALA. CODE §17-11-4(d); Doc. 74-1 ¶ 8; Doc. 74-2 ¶ 8; Doc. 74-3 ¶ 6; Doc. 74-4 ¶ 3. SB1 poses no obstacle to their right to choose and receive help from these trustworthy assistors. *See* Doc. 73-2 ¶¶17-18; Doc. 73-3 ¶¶14. And as to SB1's Submission Provision, any "voter who requires assistance" with submission can receive it. *See* ALA. CODE §17-11-4(e); *infra* Part I.C.

For instance, one physically disabled declarant prefers assistance from her mother, without any indication that her mother is paid to handle absentee applications. Doc. 74-3 ¶6. Two others strongly prefer to have their long-time neighbor obtain and submit their applications, but they fear she cannot legally help because her volunteer organization has previously given her pens and t-shirts. Doc. 74-1 ¶¶6, 7; Doc. 74-2 ¶¶6, 7. Finally, the last voter identifies ADAP, not "an individual," as his preferred assistor, and—like the two previous declarants (*id.* ¶8)—surmises that his full-time health assistants cannot legally lend a hand because they are paid to care for him. Doc. 74-4 ¶8. Unless the caregivers' get a bonus *for*

absentee ballot application services, there is no evidence that they are prohibited from assisting. ALA. CODE §17-11-4(d). Based on the evidence presented, SB1 "would affect so few" assistors preferred by §208 voters "that its rule of law" does "not create a legal 'obstacle' to" §208's objective. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000).

In sum, SB1 imposes little to no burden on a disabled person's right to vote without fear or intimidation; to the contrary, SB1 further safeguards that right. The State prohibits the buying and selling of voting assistance like it prohibits the buying and selling of votes. The State has found (like many others) that the purchase and sale of voting services creates a recipe for manipulation, intimidation, and fraud— the very harms §208 protects against. Tellingly, Plaintiffs have not alleged that SB1 would impose an undue burden on the right of disabled voters *to choose* an assistor. *See Priorities USA*, 487 F. Supp. 3d at 619-20. Instead, they hang their hat on the notion that Congress established a "fixed universe" of assistors that the State may never alter, no matter how slight or how justified the regulation may be. Doc. 50 at 42, 46; Doc. 62 at 104:22, 107:1, 117:7. That would amount to an "any burden" test, not an "undue burden" test. Nothing in the text of §208 supports that "any burden" standard, *see supra*, and nothing in the record reveals an undue burden.

**b. Any slight burden is fully justified.** Hypothetically, some §208 voter might lose out on her first choice of helpers because that person would provide help

only in return for payment. That minor burden on the voter's right to choose would not rise to the level of being *undue* in light of the State's important interests in combatting voter fraud, maintaining public confidence in the integrity of the electoral process, and protecting voters from confusion and undue influence.

Unfortunately, there is a long history in Alabama (and elsewhere) of corrupt actors targeting the absentee ballots of unsophisticated, low literacy voters. Doc. 73-1 ¶11. In rural counties, candidates completed absentee applications and ballots in assembly-line fashion and exchanged goods to obtain voters' absentee materials. *Id*. ¶¶9, 24. Ballot harvesters have "work[ed] the absentees" in recent election cycles and can swing local elections. Doc. 73-2 ¶¶15, 16, 22; Doc. 73-3 ¶7. Immediately preceding SB1, a select few rural counties saw high absentee voting rates with unusually wide disparities between absentee and in-person ballots. *See generally* Doc. 73-4 (describing absentee voting figures in Alabama counties).

The district court recognized that SB1 "was an exercise of Alabama's legitimate *right* to establish procedures it deems necessary for free and fair elections." Doc. 69 at 55; *see also id.* at 2 ("SB1 was enacted to prevent absentee ballot fraud."). Despite acknowledging that "voter fraud may be a problem" in Alabama, *id.* at 42, the Court discounted the State's legitimate interests when enjoining SB1 because the "injunction does not in any way prevent Alabama from prosecuting voter fraud when it occurs." Doc. 76 at 12.

That misidentifies the State's compelling interest, which is to prevent voter fraud and intimidation *before* it occurs. *League of Women Voters of Fla. v. Fla. Sec'y of State*, 81 F.4th 1328, 1333-34 (11th Cir. 2023) (en banc) (explaining legislatures are entitled to enact "legislation that aims to prevent future fraud"). Prosecution of fraudulent actors after they steal votes does not remedy the harm they inflict. *See Brakebill v. Jaeger*, 905 F.3d 553, 560 (8th Cir. 2018).

And the district court's rosy assumptions about the efficacy of after-the-fact prosecutions ignores the reality that this misconduct is difficult to detect and punish. Many illiterate or disabled voters may *never know* that their votes have been stolen, making the prospect of prosecuting wrongdoers illusory. While "massive absentee ballot fraud" was uncovered in *Marks*, 19 F.3d at 887, "[m]any voters who cast absentee ballots" later "testified" in federal court "that they were unaware that they had signed absentee ballot applications," *id.* at 877. And the ballot harvester at the heart of the voter intimidation scheme in *Qualkinbush* took steps "designed to keep the extent of his assistance unknown and less likely to be detected." *Qualkinbush*, 826 N.E.2d at 1190. While he was caught, there is no reason to assume that the only fraud that occurs is the fraud that is detected. *See Brnovich*, 594 U.S. at 685 ("Vote buying schemes are far more difficult to detect when citizens vote by mail.").[13]

---

[13] Because of the difficulty in detecting absentee voter fraud, the Carter-Baker Report implored "[a]ll states" to outright "prohibit[] 'third-party' organizations,

Likewise, SB1 was a response to documented cases of absentee voter fraud that occurred even after Alabama had outlawed voter fraud. Recent mayoral and city council elections have been overturned due to absentee ballot fraud, and candidates and other political activists have been convicted of fraudulently handling absentee ballot applications. *See generally*, Docs. 42 at 8-9 & 46 at 6. Former Assistant Attorney General Gregory Biggs prosecuted voter fraud cases in several Alabama counties and testified that fraudsters employed "an assembly line process to complete their stolen absentee applications, affidavits, and ballots." Doc. 46-1 ¶9. Sometimes, fraudsters "requested the application materials and ballots without the voter's knowledge," and in other instances, they would steal mail or "convince, threaten, or bribe" voters to surrender absentee materials. *Id.* ¶¶9-10. The Legislature thus reached the understandable conclusion that more was needed to detect and deter these schemes.

And these facts underscore why it is indisputable that the State may act prophylactically to prevent fraud and intimidation. *See, e.g.*, *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1334 (11th Cir. 2021) ("[D]eterring voter fraud is a legitimate policy on which to enact an election law, even in the absence of any record evidence of voter fraud."). Such protections are

---

candidates, and political party activists from handling absentee ballots." Building Confidence in U.S. Elections 46-47.

especially warranted when "the scope of … pernicious practices can never be reliably ascertained." *Buckley v. Valeo*, 424 U.S. 1, 27 (1976). For example, in *Buckley v. Valeo*, the Supreme Court rejected the argument that campaign contribution limits were unjustified because bribery laws could "deal[] with 'proven and suspected quid pro quo arrangements.'" *Id.* at 27-28. Likewise here, the State was not required to merely hope that prosecutions would suffice to deal with absentee ballot application fraud.

### C.    SB1's Submission Provision does not conflict with Section 208.

Defendant has consistently and repeatedly emphasized that "voters who cannot physically submit their application may receive 'require[d] assistance' consistent with SB1." Doc. 72 at 7 (quoting ALA. CODE §17-11-4(e)); *accord* Doc. 42 at 3, 38, 44 n.19; Doc. 46 at 3. Under SB1's Submission Provision, the default is that only the voter may submit his or her own absentee ballot application. *See* ALA. CODE §17-11-4(c)(2). Yet SB1 clearly states that "[a]ny voter who *requires assistance* to vote by reason of blindness, disability, or inability to read or write may be given assistance." ALA. CODE §17-11-4(e) (emphasis added).

SB1's incorporation of §208 into subsection (e) "brings the old soil with it." *Hall v. Hall*, 584 U.S. 59, 73 (2018). That soil, without question, authorizes voters to receive submission assistance necessitated "by reason of blindness, disability, or

inability to read or write." ALA. CODE §17-11-4(e).[14] The "two sections of the statute"—(c) and (e)—must be read "harmoniously so that one [does] not nullify the other." SCALIA & GARNER, *Reading Law* 180. Thus, reading SB1's provisions "as harmoniously as possible," blind and disabled voters in need of help can get it and will not face criminal prosecution for asking a friend to place their application in the mailbox. *Wachovia Bank, N.A. v. United States*, 455 F.3d 1261, 1268 (11th Cir. 2006).

Rather than read these statutory provisions "so as not to create a conflict," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 370 (1986), the district court pitted them against each other, deciding that "SB 1's Submission Restriction flatly prohibits third-party ballot-return assistance to disabled voters needing such assistance." Doc. 69 at 54; Doc. 85 at 9. Plaintiffs, in turn, argued that while §17-11-4(e) *might* permit disabled voters to "receive" required assistance, the Submission Provision prohibits anyone from "giving" that necessary help, thus rendering the right to receive assistance "illusory." ECF 21 at 20. This renders §17-11-4(e)'s protections "insignificant, if not wholly superfluous." *Duncan v. Walker*, 533 U.S. 167, 174 (2001). There is no good reason to adopt such a selective reading. And when doing

---

[14] *See* 52 U.S.C. §10310(c)(1) (defining "vote" and "voting" under the VRA to "include all action necessary to make a vote effective").

so would result in the preemption of state law, failing to read SB1's provisions in harmony constitutes yet another legal error.

Indeed, the district court below committed the error made by the district court in *Henry v. Attorney General, Alabama*, 45 F.4th 1272 (11th Cir. 2022). There, a district court had adopted a broad reading of a state law that created constitutional concerns and declared the law facially unconstitutional, even though the Alabama Attorney General had rejected that very reading in favor of a narrower reading. *Id.* at 1292. This Court reversed, explaining that "to the extent there is any doubt, we will 'uphold a state statute against a facial challenge if the statute is readily susceptible to a narrowing construction that avoids constitutional infirmities.'" *Id.* SB1 is readily susceptible to a reading that avoids the Supremacy Clause concerns posed by §208, the Alabama Attorney General has read SB1 in that sensible manner. Thus, as in *Henry*, this Court should reverse.

## II.    The District Court Erred in Presuming Irreparable Harm.

The district court discussed two candidates for irreparable harm, and both fail. First, the district court identified "the irreparable harm of not being able to obtain legally protected assistance," Doc. 76 at 12, but it cited and relied upon no evidence that such harm is real. Given its view that §208 confers a statutory right to *any* voting assistant who is not a union official or employer, the court deemed any "fact submissions" "unnecessary to the court's injunctive-relief determination." *Id.* at 9.

50

But "proof of irreparable injury is an indispensable prerequisite to a preliminary injunction." *Siegel v. LePore*, 234 F.3d 1163, 1179 (11th Cir. 2000) (per curiam). Violation of a federal statute, even one intended to prevent irreparable harm, does not by itself give rise to a presumption of irreparable harm. *See Amoco Production Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). The asserted injuries flowing from the Compensation Provisions boil down to preferring absentee ballot application assistance from someone paid for doing so and unwilling to help without that compensation. Without more, such an injury is hypothetical and trivial, not concrete and irreparable.

The other injury identified by the district court was the irreparable "harm envisioned by §208"—denial of the right to vote. Doc. 76 at 12. While "missing the opportunity to vote in an election is an irreparable harm for the purposes of a preliminary injunction," *Gonzalez v. Gov. of Ga.*, 978 F.3d 1266, 1272 (11th Cir. 2020), the district court stopped short of finding that the Payment Provisions "likely" inflicted that harm, *Winter v. NRDC*, 555 U.S. 7, 22 (2008). *See* Doc. 76 at 12. Plaintiffs' §208 declarations show just how *unlikely* it is that the opportunity to vote hinges on the availability of paid assistors. The declarations prove that voters can receive assistance from their caregivers, family, and neighbors. *E.g.*, Doc. 74-1. Plaintiffs misinterpret the Submission Provision to require a disabled voter to perform the physical mechanics of voting absentee, Doc. 74-4 ¶3, while ignoring

how SB1 authorizes assistance for disabled voters. *See* ALA. CODE §17-11-4(e). To the extent Plaintiffs and their members alter their behavior based on a misreading of SB1, such self-inflicted wounds hardly establish standing, *c.f. Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 410 (2013), let alone irreparable harm. Properly construed, SB1 is unlikely to burden any §208 voter's fundamental right to vote.

## CONCLUSION

The Court should reverse the district court's preliminary injunction.

December 2, 2024                                   Respectfully submitted,

Steve Marshall
  *Attorney General*
s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*
Soren Geiger
  *Assistant Solicitor General*
Charles McKay
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B)(i). This brief contains 12,741 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f).

In addition, this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: December 2, 2024

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I certify that on December 2, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve all counsel of record.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Defendant-Appellant*